UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE


MAY MILLER and
TIMOTHY MILLER                                                                                    PLAINTIFFS


v.                                                           CIVIL ACTION NO. 3:14-cv-00443-CRS


COTY, INC. and
COTY US, LLC                                                                                       DEFENDANTS


## MEMORANDUM OPINION

This matter is before the court on motion of the Defendants, Coty, Inc. and Coty, US,

LLC (collectively, "Coty"), for summary judgment.  The Defendants also move for exclusion of

expert testimony.  For the reasons stated herein, the court will **GRANT IN PART** and **DENY**

**IN PART** the Defendants' motion to exclude expert testimony.  The court likewise will **GRANT**

**IN PART** and **DENY IN PART** the Defendants' motion for summary judgment.

## I.       BACKGROUND

This case arises from an injury sustained while using an at-home hair-removal waxing

kit.  In May of 2013, Timothy Miller ("Timothy") purchased a "Sally Hansen Extra Strength All-

Over Body Wax Kit" ("Product"), a product acquired by Coty in 2008, from a retail store for

$9.98.  (DN 53, Exh. 1.)  Timothy alleges that he purchased the Product for his wife, Plaintiff

May Miller ("May"), to be used on her "pubic area"[1] after discussing the topic of waxing.  (*Id*. at

7.)  Neither Plaintiff researched waxing kits prior to purchasing the Product.  (*Id*. at 8.)  May

---

[1] For the purposes of this Memoradum Opinion, the term "pubic area" will refer to the area of the female anatomy encompassing the vagina, including the mons pubis and the labia majora.

claims that she had previously purchased waxing kits for her eyebrows and legs but could not recall the specific brand or product that she used.  (*Id*. at Exh. 2, 19.)

The Plaintiffs decided to use the waxing kit at home later that month.  (*Id*. at Exh. 2, 23.) Both Millers testified to reading the instruction sheet included inside the Product box.  (*Id.* at Exh. 1, Exh. 2, 24.)  May claims to have read the instructions once, while Timothy alleges that he read the entire instruction sheet twice, once earlier in the evening and once immediately prior to using the Product.  (*Id*. at Exh. 1, 10.)  Timothy also claims that he watched two online videos demonstrating the general use of home-waxing kits.  (*Id*. at 1.)  The videos were not produced or approved by Coty and Timothy could not recall the brand or type of wax used in these videos. (*Id*.)  However, Timothy claims that both videos demonstrated how to wax the "pubic area" of a woman, generally.  (*Id*.)

Timothy prepared the wax by melting it on high in the microwave per the instructions and prepared the waxing strips by cutting them into smaller pieces.  (*Id*. at 14 – 15.)  May lay flat on her back while Timothy applied the wax.  (*Id*. at 15.)  He maintains that he began applying the wax on the outer edge of May's hair line in the "pubic area" on the right side of her body.  (*Id*.) He alleges that he applied the wax with a spatula in one to two inch strips in the direction of the hair growth.  (*Id*. at 16.)  Then he pressed a strip onto the applied wax, rubbing the strip with pressure a couple of times with his finger.  (*Id*.)  He claims that he held the skin taut while quickly pulling in the opposite direction of the hair growth, keeping his hand close to her body as the instructions indicated.  (*Id*.)

According to the Millers, Timothy managed to successfully wax several portions of hair off May's body in the "pubic area."  (*Id*. at 17.)  The injury occurred while Timothy was waxing a section of hair on May's left labia majora.  Timothy explained that he applied the wax to May's

left labia majora, held the skin taut, and pulled the strip. (*Id*. at 16 – 18.) As he pulled the strip, the skin on May's labia majora tore. (*Id*. at 18.) May testified that the strip of skin that tore was adjacent to the area that was actually waxed, rather than the skin directly under the waxing strip. (DN 53, Exh. 2, 28 -29.)

"Almost immediately" after the tear occurred, the Millers went to the Emergency Room to have May's injury treated. (*Id*. at 40.) While there, May received sutures, antibiotics, and pain medication. (*Id*. at 41.) Immediately following the injury, May experienced bruising and swelling around the injury site. (*Id*.) May claims that she experiences numbness and lasting pain, including a "burning sensation" in the area surrounding the injury. (*Id*. at 47.) May further states that she has an approximately three and a half inch scar on her labia majora with several areas of puckering and an extra fold of skin. (*Id*. at 52.)

There is no dispute that the Millers read the Product packaging and instructions, including the Product warnings. There is also no dispute as to the specific language used in the instructions and warning. The front of the box states the following: "Extra Strength All-Over Body Wax Kit;" "Brazilian Formula Removes Hard to Remove Hair;" "Smart Wax Grabs Hair, Not Skin." (DN 53, Exh. 4.) The back of the box additionally states: "Eliminates Even the Most Stubborn, Unwanted Hair" and "Great for Body, Legs, Arms, Bikini and More." (*Id*.) The side of the box includes this language: "IMPORTANT: Read and follow enclosed directions and cautions carefully before proceeding." (*Id*.)

An instruction sheet was contained inside the packaging. The instruction sheet states that the product is "Perfect For: Body, Arms, Bikini Area, Legs, Underarms, and More!" (DN 53, Exh. 3.) It also warns: "PLEASE READ THIS INTRUCTION BOOKLET CAREFULLY BEFORE PROCEEDING WITH TREATMENT. FAILURE TO FOLLOW WARNINGS AND

INSTRUCTIONS MAY RESULT IN SEVERE SKIN IRRITATION, SKIN REMOVAL OR OTHER INJURY." (*Id.*)

The instruction sheet contains a section entitled "CAUTION." (*Id.*) One of the bullet points in this section states the following: "DO NOT use on irritated, chapped, sunburned or cut skin, over moles or warts, or after a hot bath. NEVER use on nipples, perianal, vaginal/genital areas, or on hairs inside nostrils, ears or on eyelids/eyelashes." (*Id.*)

Lastly, the instruction sheet contains "TIPS" for certain areas of the body. (*Id.*) For the "BIKINI LINE" area, the tips suggest to "Always hold skin taut. Work in small areas from the outer bikini line to the inner bikini line." (*Id.*) Next to the tips, there is a small, simple line drawing of a female torso and thighs with the pubic area covered by a bikini. (*Id.*) The words "Apply" and "Remove" are accompanied by arrows and the hand of the figure appears to be waxing a portion of the upper thigh. (*Id.*) No additional warnings are given in this section.

According to the Millers, they believe that they followed all of the directions in applying the wax. May testified that she believes the "bikini area," as stated on the Product packaging and in the instructions, to be anywhere hair could potentially show while wearing a bikini, including portions of the labia majora. (DN 53, Exh. 2, 35 – 36.) May stated that, depending on the bikini's style, and taking in consideration the shifting of fabric, outer portions of the labia majora could be exposed in a bikini. (*Id.*) When May read the section of the instructions warning consumers never to use the Product on "vaginal/genital areas," she did not believe that this included the portions of the labia majora that could potentially be exposed in a bikini. (*Id.*)

Based upon these facts, the Millers bring claims against Coty under Kentucky's laws of products liability, breach of warranty, and consumer protection. Additionally, the Millers seek

loss of consortium and punitive damages.  Coty now moves for summary judgment on each count of the Amended Complaint.

## II.     STANDARD

A party moving for summary judgment must show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The moving party bears the burden of demonstrating the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).   Additionally, the Court must draw all factual inferences in favor of the nonmoving party.  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  A genuine issue for trial exists when "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby*, 477 U.S. 242, 249 (1986).

## III.    DISCUSSION

Plaintiffs' Amended Complaint contains the following counts: Strict Liability; Negligence; Failure to Warn; Breach of Implied Warranty of Merchantability; Breach of Express Warranty; Breach of Implied Warranty of Fitness for a Particular Purpose; violation of Kentucky's Consumer Protection Act; Loss of Consortium; and Punitive Damages.   The Defendants move for summary judgment on each of the counts.  The court will first address the Defendants' Motion to Exclude Plaintiffs' Expert Testimony (DN 54), as the use and scope of the testimony is essential to the resolution of the case.[2]

### A.  Expert Testimony

The Plaintiffs offer the testimony of three experts in support of their claims. Carol Pollack-Nelson, Ph.D. ("Dr. Pollack-Nelson"), is offered as a human factors expert, William F.

---

[2] The Defendants also move the court to limit repetitive expert testimony under Federal Rule of Evidence 403.  A trial date not having been set at this time, this issue is premature.

Kitzes, J.D. ("Mr. Kitzes"), is offered as a products safety management expert, and Eva Desiree Carden ("Ms. Carden") is offered as an expert on waxing procedures. Coty seeks to exclude each of the three experts' testimony in their entirety. In the alternative, Coty asks that "the testimony of Dr. Pollack-Nelson and William Kitzes be limited to the subject of the Defendants' product warning label." (DN 54, 12.)

Federal Rule of Evidence 702 outlines the admissibility of expert testimony:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or otherwise specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

Courts also may consider the following non-exhaustive factors to assess reliability of expert testimony: (1) whether the theory can be or has been tested; (2) whether the technique or theory has been subjected to peer review and publication; (3) the known or potential rate of error and the existence and maintenance of standards controlling the theory or technique's operation; and (4) the extent to which a known technique or theory has gained general acceptance within a relevant scientific community. *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 594 (1993). The purpose of the rule is "to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999).

Lastly, the court notes the role of cross-examination in challenging the persuasive weight to be given to admissible expert testimony. If the court finds the proffered expert testimony to be relevant and reliable, it is "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof" that is "the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596.

For the following reasons, Coty's motion for exclusion of expert testimony will be granted only to the extent it seeks to preclude Dr. Pollack-Nelson and Mr. Kitzes from testifying about the underlying Product design. The motion to exclude the testimony of Ms. Carden will be denied.

### 1. Carol Pollack-Nelson, Ph.D.

Carol Pollack-Nelson, Ph.D., is offered as a human factors expert. Generally, human factors experts tend to have specialized knowledge in "human perception and awareness," and are concerned with "the interrelationship of a human's inherent capabilities and limitations with product designs and the surrounding environment." *Using the Human Factors Expert in Civil Litigation*, 40 Am. Jur. Trials 629 § 1. Human factors experts are also used to provide opinions on the effectiveness or adequacy of warnings. *Id*. at § 7.

Dr. Pollack-Nelson is expected to testify about the human perception of, and interaction with, the Product packaging and instructions. The Defendants seek to exclude her opinion that "Warnings, instructions and other marketing information on and associated with the Sally Hansen Extra Strength All-Over Body Wax Kit are both misleading and fail to adequately advise consumers of the hazards associated with the product and how to avoid such hazards." (DN 53, Exh. 7, 1.)

Dr. Pollack-Nelson holds a doctorate degree in Industrial/Organizational Psychology and has worked in the field of consumer product safety since 1982. (DN 53, Ex. 7, 1.) Between 1988 and 1993, Dr. Pollack-Nelson was employed by the U.S. Consumer Product Safety Commission in the Human Factors Division as a Senior Engineering Psychologist. (*Id.*) She claims that "evaluating warnings and labels and marketing" is central to her everyday practice. (DN 53, Exh. 6, 20.) Dr. Pollack-Nelson alleges that she has evaluated the labels and warnings of various consumer products including, among others, cosmetics, over the counter medicine, and hair products. (*Id.* at 11.) However, Dr. Pollack-Nelson has no professional experience in evaluating the warnings, labels, or marketing of waxing products. There is no dispute that she did not rely on specific scientific research or studies concerning the design of at-home waxing kits, waxing formulas, or waxing-related risks. Likewise, she did not perform any tests, studies, or consumer surveys on the Product in question. (*Id.* at 31.)

In reaching her conclusions, Dr. Pollack-Nelson reviewed different versions of packaging for Sally Hansen Extra Strength All-Over Body Wax. (DN 53, Exh. 7, 2.) She purchased a Sally Hansen Extra Strength All-Over Body Wax Kit from a drugstore and reviewed the Product packaging, warnings, and instructions. (*Id.*) She reviewed the deposition testimony of the Plaintiffs and the Defendants' representatives as well as incident data involving the Product. (*Id.*) She claims that she relied on her "knowledge of human behavior as it relates to consumer product warnings, instructions, and design" with the experience she gained "over the past 25 years as a human factors psychologist and researcher." (*Id.* at 1.)

Initially, the court agrees that Dr. Pollack-Nelson is precluded from testifying on any matters regarding the underlying "design, manufacture, or inherent safety qualities of the product." There is no dispute that Dr. Pollack-Nelson has no professional experience related to

waxing products or any product similar enough to make her an expert on the underlying Product. The Plaintiffs do not provide any evidence that Dr. Pollack-Nelson is qualified to testify as an expert as to the Product's underlying design, and consequently any such opinion requiring specialized knowledge of waxing will be excluded. Therefore, Dr. Pollack Nelson is precluded from giving an opinion on her personal understanding of waxing-specific terms, the differences between hard waxes and soft waxes, the formula of the Product, the types of injuries that can be caused by waxing, and the "intended" use of the Product. These opinions are excludable because they either rely on personal opinions or informal internet searches, neither of which are reliable sources of opinions under Rule 702 or *Daubert*.[3]

The more critical issue is whether Dr. Pollack-Nelson may offer testimony related to the labeling, marketing, and instructions of the Product. Specifically, the court, in its role as "gatekeeper," must determine whether her proffered testimony on the Product's marketing, labeling, and instructions is relevant and reliable under Rule 702 and *Daubert*.

The Defendants argue that Dr. Pollack-Nelson cannot testify that "the marketing information and instructions for the product is [sic] misleading" because she does not have the expertise to testify as to "whether this particular Product, or any waxing product, is designed to remove coarser hair, such as in the bikini area." They further argue that "Her opinions are based upon the assumption that Ms. Miller's injury was caused by the Product, a soft wax marketed to be used in the bikini area." (DN 64, 5.)

The court is not convinced by the Defendants' argument that expertise on the underlying Product is necessary to give any reliable opinions on the Product's instructions and warnings. While Dr. Pollack-Nelson may not testify as to what the product was *designed* to do – such as

---

[3] For example, Dr. Pollack-Nelson stated in one portion of her expert report that "[A] quick search on Google and Youtube confirms" the definition of a Brazilian Wax. (DN 53, Exh. 7, 5.)

whether the formula was designed to remove coarse hair – she may testify as to how consumers might interact with and understand the Product based on the packaging, instructions, and warnings. Additionally, Dr. Pollack-Nelson need not testify that the use of soft wax, rather than hard wax, caused May's injury in order to give an opinion on consumer expectations about where the Product can be used and the adequacy of warnings in terms of specificity and ambiguity. Therefore, while Dr. Pollack-Nelson may not opine that the Product is misleading based upon her personal understanding of the Product's intended use, she may testify as to how consumers, presumably also inexpert in waxing design, may interact with and understand the Product. Such opinions are based not upon the underlying Product design, but based upon applying her twenty-five years of experience in the established field of human factors.

After review of Dr. Pollack-Nelson's expert report, the court finds her human factors opinions on the Product's packaging, instructions, and warnings sufficiently reliable as to be admissible under Rule 702 because she applied her extensive experience in an established field of psychology. Further, her testimony is relevant because it may help the jury determine the factual issues of foreseeable use of the Product and the adequacy of the Product's warnings. For these reasons, Dr. Pollack-Nelson's testimony will be excluded to the extent she seeks to give opinions that require an understanding of the underlying Product design, but will be admitted to the extent she testifies to the Product's packaging, instructions, and warnings in terms of consumer expectation and understanding.

### 2. *William F. Kitzes, J.D.*

Mr. Kitzes is a Board Certified Product Safety Manager and Hazard Control Manager offered as an expert in product safety management. (DN 53, Exh. 9, 5.) According to Mr. Kitzes, product safety management theory has been published and reviewed by scholars in the

field for over fifty years. (*Id.* at 2.) The goal of this theory is to protect consumers before they purchase products. (*Id.*) Generally, product safety managers develop a company's procedures to identify hazards in products, assess the risks, apply adequate safety measures to eliminate hazards from the design, place guards between users and potential injuries, and warn users of all the hazards that have not been eliminated. (*Id.* at 1.)

Mr. Kitzes is expected to testify on the application of product safety management to the Product's packaging, instructions, and warnings. This includes the opinions that Coty failed to provide adequate warnings on the Product, that Coty did not follow product safety guidelines, and that the Product does not comply with the Food and Drug Administration (FDA) labeling requirements. (*Id.* at 10 – 11.)

Mr. Kitzes holds a certificate in Safety Management from the American Society of Safety Engineers, a certificate in Risk Communication from the Harvard School of Public Health, and is a member of the Human Factors and Ergonomics Society. (*Id.* at 5) Mr. Kitzes has worked in risk assessment and product safety management for the past thirty years. Between 1974 and 1981, he worked at the U.S. Consumer Product Safety Commission. He has analyzed the product safety management and warnings of cosmetics, including a deodorant product. (DN 53, Exh. 8, 12.) Throughout his career, Mr. Kitzes has developed on-product warnings and instructions, has lectured at the National Safety Council Annual Congress and Exposition, and has published an article in the Journal of the American Society of Safety Engineers. (*Id.* at 7 – 8.)

Similar to Dr. Pollack-Nelson, Mr. Kitzes has no expertise in the Product or waxing in general. He likewise has not performed any tests, surveys, or studies on or about the Product. (DN 53, Exh. 8, 30 – 31.) In reaching his conclusions, he reviewed depositions taken for this

case, incident data, customer complaints, various other Coty documents produced in discovery, and multiple versions of the Product's instructions. (*Id*. at 12 – 35.)

In arguing for the exclusion of Mr. Kitzes' testimony, the Defendants make many of the same arguments they used for the exclusion of Dr. Pollack-Nelson's testimony: that Mr. Kitzes has no expertise in the waxing or cosmetic industry; that he did not perform any tests or studies on the Product or any other waxing product; and that his opinions rely on assumptions about the underlying Product, such as that the injury was caused by the use of a soft wax, rather than a hard wax. As with Dr. Pollack-Nelson, the court agrees that Mr. Kitzes does not qualify as an expert on waxing or on the Product's underlying design. As such, any testimony concerning Mr. Kitzes' personal understanding of waxing-specific terms and procedures, the underlying Product formula, the intended use of the Product, and the types of injuries that may be caused by hard or soft waxes will be excluded as unreliable under Rule 702.

In addition to testimony related to the design of the underlying Product, Coty specifically objects to the admission of an alternative warning proposed by Mr. Kitzes in his expert report. This proposed alternative states, in part, that "Wax can rip or tear skin in sensitive areas and require stitches to close serious lacerations." (DN 53, Exh. 9, 38.) The Defendants argue that this "sample warning" is unreliable both because it comments on the risks associated with the underlying Product and because there are no studies, testing, or focus groups completed on this proposed warning to suggest that it would be any more effective than the existing warning.

The court agrees that the proposed warning is unreliable and inadmissible. It comments on the specific risks associated with waxing, risks of which Mr. Kitzes has no expert knowledge. Additionally, while Mr. Kitzes may have a reliable basis in opining on the effectiveness of such characteristics as font size, font color, or specificity of the existing warning language, the court

finds that the introduction of a proposed warning with original drawings, untested through surveys or focus groups, falls short of the reliability factors in Rule 702 and would not aid a jury in understanding the adequacy of the existing warning. Therefore, Mr. Kitzes' proposed warning will be excluded and Mr. Kitzes' testimony will be confined to applying his expert knowledge to the existing Product packaging, instructions, and warnings.

Mr. Kitzes' proffered testimony on the adequacy of the Product's existing warning, in terms of the application of product safety management theory and compliance with FDA labeling requirements, is sufficiently reliable due to Mr. Kitzes' long experience in applying such established and peer-reviewed theories to consumer products. Additionally, this testimony is relevant under Rule 702 because it may help the jury determine factual issues such as foreseeable use and the adequacy of the Product warning. For these reasons, the court will admit Mr. Kitzes testimony to the extent he testifies to the Product's packaging, labeling, and warnings.

### 3. *Eva Desiree Carden*

Ms. Carden is a licensed cosmetologist and esthetician in the Commonwealth of Kentucky and is offered as an expert on waxing procedures. In order to meet the state requirements to practice as a cosmetologist, individuals must complete 1,800 hours of education, pass a written and practical examination, and complete a six-month apprenticeship. Beyond holding a cosmetology license, Ms. Carden has been the Director of PJ's College of Cosmetology in Louisville, Kentucky for the past twenty-five years. Throughout her career, she has performed "enumerable" waxing procedures and has "taught the fundamentals of esthetics and waxing to cosmetology and esthetician students." (*Id*. at 1.) Ms. Carden testified that at one point in her career, she completed approximately forty to sixty Bikini and Brazilian waxes on clients per week. (DN 53, Exh. 10, 23.)

Ms. Carden is expected to testify that the Sally Hansen Extra Strength All-Over Body Wax Kit is a type of "soft wax," that hard wax is the preferred type of wax to be used in the "bikini area" and for Brazilian waxes, and testify on the definition and consumer understanding of a "Brazilian wax." In reaching these conclusions, Ms. Carden reviewed deposition testimony taken in this case, medical records and pictures regarding May's injury, and the Product itself, including its packaging and instructions.

The Defendants argue that Ms. Carden "has no education or experience that would render her qualified to evaluate the design, manufacture, or inherent safety of the Product." (DN 54, 10.) Defendants further emphasize that she "has no knowledge of the chemical makeup of a soft wax or a hard wax" and that she has no knowledge of product warning requirements and regulations. (DN 64 at 9.) In response, the Plaintiffs argue that expert knowledge of the chemical composition of a wax is not necessary to give a reliable opinion in this case. Rather, they argue that Ms. Carden's knowledge and experience gained in over twenty-five years in the industry, both in teaching waxing procedures and performing them, enables her to identify a hard wax versus a soft wax and to know which type of wax is more appropriate in different circumstances.

The court agrees with the Plaintiffs that Ms. Carden's knowledge and expertise in the field makes her expected testimony reliable. An expert opinion may be considered reliable by virtue of the expert's sufficient practical experience in a technical field. *See First Tenn. Bank Nat. Ass'n v. Barreto*, 268 F.3d 319, 333-34 (6th Cir. 2001). Indeed, the reliability factors used in *Daubert* may be of "limited utility in the context of non-scientific expert testimony." *Id*. at 334. In this case, Ms. Carden's twenty-five years in performing and teaching waxing should enable her to opine on the basic differences between hard waxes and soft waxes, to spot the

different types of waxes, and to testify to the preferred types of waxes to be used in different areas of the body. These opinions are relevant for aiding the jury in understanding such factual issues of foreseeable misuse and potential alternative product designs. Therefore, the court will deny the Defendants' motion to exclude the testimony of Ms. Carden. As with all of the Plaintiffs' experts in this case, the Defendants may emphasize any perceived deficiencies in their expertise and reliability through cross-examination and the admittance of opposing testimony or evidence.

### B. Products Liability Claims

Kentucky Products Liability law controls in this case. In Kentucky, plaintiffs may assert three different causes of action against a manufacturer: strict liability, negligence, and breach of warranty. *Williams v. Fulmer*, 695 S.W.2d 411, 413 (Ky. 1985). Kentucky also recognizes three theories of products liability: manufacturing defect, design defect, and failure to warn. *Clark v. Hauck Mfg. Co.*, 910 S.W.2d 247, 251 (Ky. 1995), *overruled on other grounds by Martin v. Ohio Cnty. Hosp. Corp.*, 295 S.W.3d 104 (Ky. 2009). Regardless of the theory of products liability alleged, a Kentucky plaintiff must prove the existence of a defect as well as legal causation. *Prather v. Abbot Laboratories*, 960 F. Supp.2d 700, 706 (W.D. Ky. 2013).

The Kentucky Products Liability Act presumes that a product is not defective if "the design, methods of manufacture, and testing conformed to the generally recognized and prevailing standards or the state of the art in existence at the time the design was prepared, and the product was manufactured." Ky. Rev. Stat. § 411.310(2). If the presumption applies, a plaintiff may rebut the presumption with evidence that the product is nevertheless defective. The plaintiff need not present "evidence that the design did not conform to prevailing standards or was not state of the art at that time." *Murphy ex rel. Murphy v. Montgomery Elevator Co.*, 957

S.W.2d 297, 300 (Ky. Ct. App. 1997). Ultimately, "The statutory presumptions of KRS 411.310 do no more than leave the burden of proof with [the plaintiff] to prove that the [product] was defective." *Leslie v. Cincinnati Sub-Zero Prod., Inc.*, 961 S.W.2d 799, 803 (Ky. Ct. App. 1998).

The Defendants argue that the Product is entitled to the presumption that it is not defective because the record indicates that "the Product's design, manufacturing, and testing conformed to prevailing industry standards." The Defendants, through the testimony of their corporate representative, Mr. Michael Knopf, argue that the Product itself and its component raw ingredients went through comprehensive testing and review in compliance with industry standards before being placed on the market. (DN 53, Exh. 5.) The Plaintiffs, on the other hand, do not specifically respond to the Defendants' allegation that Coty is entitled to the statutory presumption. In fact, the Plaintiffs produced no evidence on the design, manufacture, or testing of any other at-home waxing products. While the Plaintiffs present expert testimony that the Product is a type of "soft wax," and that "hard wax" is the preferred wax to be used in the pubic area, this evidence is insufficient to establish that the Product fell short of prevailing industry standards. Therefore, the court finds that Coty is entitled to the statutory presumption that the Product was not defective. Accordingly, the Plaintiffs have the opportunity to rebut this presumption by providing evidence that the Product was defective.

### 1. *Defective Design*

The Plaintiffs argue that the Product's defective design caused May Miller's injury. Kentucky plaintiffs may bring a defective design claim under a theory of strict liability or negligence. *Prather*, 960 F. Supp.2d at 712. Under either cause of action, the foundation of a design defect claim is that the product is "unreasonably dangerous." *Id.* (citing *Ulrich v. Kasco Abrasives Co., Ky.*, 532 S.W.2d 197, 200 (Ky. 1976)). *See also Nichols v. Union Underwear*

*Co.*, 602 S.W.2d 429, 433 (Ky. 1980) ("[T]he distinction between the so-called strict liability principle and negligence is of no practical significance so far as the standard of conduct required of the defendant is concerned.") (internal quotation and citation omitted).

When considering whether a design is in a defective condition unreasonably dangerous, the pivotal issue is "whether the product creates such a risk of an accident of the general nature of the one in question that an ordinarily prudent company engaged in the manufacture of such a product would not have put it on the market." *Montgomery Elevator Co. v. McCullough*, 676 S.W.2d 776, 780 (Ky.1984) (internal quotation omitted). Factors bearing on whether a product is unreasonably dangerous include "feasibility of making a safer product, patency of the danger, warnings and instructions, subsequent maintenance and repair, misuse, and the products' inherently unsafe characteristics." *Id.* at 780 – 81. As such, consumer expectations are "only one of the factors that should be before the jury in determining whether a product is unreasonably dangerous." *Nichols*, 602 S.W.2d at 433.

Not all of the above factors will be relevant in any given case, but the applicable factors should be construed together in making the consideration of whether a product was unreasonably dangerous.

### a. Application of Design Defect Factors

#### i. Alternative Design

"The feasibility of making a safer product" is a factor in determining whether an ordinary prudent manufacturer would have placed the Sally Hansen Extra Strength All-Over Body Wax Kit, together with the language contained on the packaging and in the instructions, on the market while knowing that its use on portions of the labia majora could lead to skin tearing. *See Scanlan*, 690 Fed. App'x. at 328. In this case, the Plaintiffs have produced evidence concerning

potential alternative designs for the underlying product and for the design of the packaging and instructions.

The Plaintiffs' expert, Ms. Carden, a licensed cosmetologist, testified that the Product is a type of soft wax, rather than hard wax. She explained that "Soft wax adheres to hair and skin, more easily to skin because it is sticky," and that soft waxes are removed with strips. (DN 53, Exh. 10, 33.) She further stated that soft wax is generally considered to be more suitable for "vellus hair," which is found on places such as arms and legs. (*Id*.) She testified that, alternatively, "hard waxes grab more coarse, bristly hair," and are "suited for sensitive areas, face, underarms, and bikini and genital areas." (*Id*.) It is Ms. Carden's opinion, based upon her training, experience, and observation, that the use of hard wax is preferred in the bikini area as the safer alternative. (*Id*. at 33-38.)

The Defendants dispute the sufficiency of Ms. Carden's testimony and argue that "there is nothing in the industry that forbids the use of soft wax for the bikini area or for Brazilian waxing." (DN 62, 8.) While this may be true, Kentucky courts allow a jury to find that a product is defective despite compliance with industry standards. *See Jones v. Hutchinson Mfg., Inc.*, 502 S.W.2d 66, 70 (finding that "if an industry adopts careless methods, it cannot be permitted to set its own uncontrolled standard.").

Further, the Plaintiffs argue that the packaging, warnings, and instructions could have been designed differently in order to make the Product safer. *See Scanlan*, 690 Fed. App'x. at 328 ("Alternatively, the packaging could have been designed to avoid misleading claims."). All three of Plaintiffs' experts testified that the design of the packaging could be improved. Ms. Carden opined that Product's packaging and instructions are misleading if the Defendants do not intend for consumers to use the Product in the pubic area. Ms. Carden testified that the term

"Brazilian formula" would lead consumers to believe the wax is appropriate for Brazilian waxing, which is a style of waxing resulting in the complete removal of pubic hair on the pubic bone and labia. (DN 53, Exh. 10, 29.) Dr. Pollack-Nelson, the Plaintiffs' human factors witness, concluded that "information should be linked to the product name to clarify what is meant by 'All-Over Body Wax'" and that this "information should be conspicuously displayed so that consumers will notice it." (DN 53, Exh. 8, 14.) Mr. Kitzes' expert opinion states that Coty should have defined "the parameters of the bikini line, area or region, all words Coty uses." (DN 53, Exh. 9, 10.) Ultimately, the Plaintiffs have produced some evidence of feasible alternative designs for the Product.

ii.       Adequacy of Warnings

"A warning might be adequate in some circumstances, but not in others." *See Scanlan*, 690 Fed. App'x. at 329. In considering the adequacy of the warning, the court should also consider the marketing and instructions of the Product. *Id.* (Noting that that a product might not be considered defective if "adequate warnings are provided regarding reasonable misuse.").

As previously discussed, the Plaintiffs have produced expert testimony that the Product instructions and marketing were misleading or were unclear. Similarly, the Plaintiffs have also introduced expert testimony that the Product's warnings were inadequate. While the Plaintiffs do not dispute that the instructions warned consumers not to use the Product on the "vaginal/genital areas," and that the failure to follow such instructions could lead to injury such as skin removal, the Plaintiffs argue that the terms "vaginal/genital" are ambiguous and inadequate. May Miller alleges that she believes that the outer portions of the labia majora, which could potentially show in a bikini, do not constitute the "vaginal/genital" areas for purposes of this Product. (DN 53, Exh. 2, 35 – 36.) Dr. Pollack-Nelson testified that these terms

are not clear "especially because the preponderance of information on the packaging indicates you can use it there." (DN 53, Exh. 6, 66.)  Mr. Kitzes agreed.  (DN 53, Exh. 8, 45.)  Mr. Kitzes further stated that the relevant warning was not "conspicuous" on the Product instructions and that the warning does not comply with FDA labeling regulations.  (DN 53, Exh. 9, 10.)  Such evidence goes towards the issue of the adequacy of the Product's warnings.

iii.    Consumer Expectations

A product fails to satisfy consumer expectations if "the product does not meet the reasonable expectations of the ordinary consumer as to its safety." *Greene v. B.F. Goodrich Avionics Sys., Inc.*, 409 F.3d 784, 789 (6th Cir. 2005).  Consumer expectations are just one factor bearing on the principal question of whether a product is unreasonably dangerous.

The Plaintiffs have produced evidence that an ordinary consumer would expect that the Product could be used safely in the pubic area, including portions of the labia majora.  May Miller claims that she believed she was complying with the instructions when she used the Product in her pubic area.  (DN 53, Exh. 2, 35 – 36.)  Ms. Carden testified that the term "Brazilian" connotes a style of waxing in which pubic hair is completely removed from the pubic bone and labia.  (DN 53, Exh. 10, 29.)  The Plaintiffs also emphasize that such terms as "All-Over" and "Bikini Area" bolster the expectation that the Product is intended for the pubic area.  (DN 53, Exh. 7, 5.)  Such testimony offered by the Plaintiffs could demonstrate that the Product does not meet the reasonable expectations of the ordinary consumer.

b.  *Conclusion of Defective Design Claim*

The principal question on the Plaintiffs' design defect claim is whether the Sally Hansen Extra Strength All-Over Body Wax Kit, together with the underlying product, packaging, and instructions, creates such a risk of an accident of the general nature of the one in question that an

ordinarily prudent company engaged in the manufacture of such a product would not have put it on the market. The Plaintiffs have presented evidence concerning alternative Product designs of both the underlying Product and packaging, the inadequacy of the warnings, and consumer expectations. On summary judgment, the Plaintiffs have introduced sufficient evidence to create a genuine issue of fact regarding whether the Product is unreasonably dangerous. While Defendants continue to emphasize that "[t]he testimony is undisputed that Coty has outlined testing protocol which complies with industry standards," the Sixth Circuit has held that there is no precedent that "compliance with industry custom can be dispositive." *Scanlan*, 690 Fed. App'x at 331. Further, the Defendants' disagreements with the issues of alternative design, adequacy of warnings, and consumer expectations are factual, rather than legal. Thus, the question of whether the Product was in a defective condition unreasonably dangerous is a question appropriate for a jury.

### c. Causation

In order to succeed on a design defect claim, plaintiffs must also establish that the product defect caused the injury. Plaintiffs may establish causation by showing that a product was a "substantial factor" in bringing about the alleged harm. *Dalton v. Animas Corp.*, 913 F. Supp.2d 370, 373 (W.D. Ky. 2012). Legal causation may be proved through circumstantial evidence. For example, a Plaintiff may submit evidence that "eliminates those causes for which the manufacturer would not be liable." *Id.* at 374 (citing *Siegel v. Dynamic Cooking Systems, Inc.*, 501 Fed. App'x. 397, 401 (6th Cir. 2012)).

The Defendants argue that, even if the court finds that the Plaintiffs have presented sufficient evidence of a design defect to survive the motion for summary judgment, the Plaintiffs have not established causation. Namely, they state that "[b]y Plaintiffs [sic] own expert

testimony, the injury suffered by Ms. Miller could have occurred even if Ms. Miller had used a hard wax." (DN 62, 9.) Ms. Carden, the Plaintiffs' cosmetology expert, did testify that waxing injuries could be caused by user error, such as failing to hold skin taught while ripping off a waxing strip. (DN 53, Exh. 10, 34.) However, the Millers allege that they followed all of the waxing instructions at the time of injury, including holding the skin taut. (DN 53, Exh. 1, 16 – 18.) On summary judgment, the court is required to construe the facts in the light most favorable to the non-moving party. Because the Plaintiffs alleged that they followed all the instructions, including holding the skin taut, the issue of causation belongs to the jury to decide whether a design defect was a "substantial factor" in causing the injury. To the extent that the Plaintiffs allege a design defect claim under a theory of strict liability or negligence, the Defendants' motion for summary judgment will be denied.

### 2. *Failure to Warn*

In addition to a design defect claim, the Plaintiffs allege liability under a theory of failure to warn. Under this theory, "a manufacturer must warn the consumer of non-obvious dangers inherent in the probable use of the product, even dangers from foreseeable misuse." *Tipton v. Michelin Tire Co.*, 101 F.3d 1145, 1150 (6th Cir. 1996) (citing *Byrd v. Proctor & Gamble Mfg. Co.*, 629 F. Supp. 602, 605 (E.D. Ky. 1986)); *See also Morales v. Am. Honda Motor Co.*, 71 F.3d 531, 537 (6th Cir. 1995) (finding that the duty to warn "extends to the dangers likely to result from foreseeable misuse of a product.").

In this case, it is undisputed that the Product instructions did warn consumers not to use the Product in the "vaginal/genital area." It is also undisputed that the instructions warned that failure to follow the Product instructions could lead to skin removal. Further, the Plaintiffs admit that they read these instructions and warnings. The crux of the Plaintiffs' argument is that these

warnings were not sufficient given the Product marketing and the foreseeable misuse of the Product. "Where the manufacturer is obligated to give an adequate warning of danger, the giving of an inadequate warning is as complete a violation of its duty as would be the failure to give any warning." *Post v. Am. Cleaning Equip. Corp.*, 437 S.W.2d 516, 521 – 22 (Ky. 1968).

The Plaintiffs argue that the Product was marketed for use in the pubic area because the packaging advertises the Product as an "All Over Body Wax" with a "Brazilian Formula" that is "Great For Body, Legs, Arms, Bikini and More." (DN 53, Exh. 3 – 4.) As previously discussed, Ms. Carden testified that a Brazilian Wax is removal of the hair in the pubic area. (DN 53, Exh. 10, 29.) Dr. Pollack-Nelson and Mr. Kitzes opined that the terms used in the packaging, instructions, and labels are ambiguous and not clearly defined. (DN 53, Exh. 6, 66; DN 53, Exh. 9, 10.) In light of such evidence, the Plaintiffs argue that the warnings were inadequate. Mr. Kitzes stated that the warning is inconspicuous in contravention of FDA regulation. (DN 53, Exh. 9, 11.) Further, both Dr. Pollack-Nelson and Mr. Kitzes commented on the relative ambiguity of the term "vaginal/genital area" and that the parameters of this area should have been more clearly indicated. (DN 53, Exh. 7, 18; DN 53, Exh. 9, 44 – 45.)

The court finds that whether the packaging was misleading, whether the language in the instructions and warnings was ambiguous, whether the misuse was foreseeable, and thus whether the warnings were inadequate to be factual issues. Further, the Millers are not required to prove that they would have behaved differently had the Product contained different warnings. *Scanlan* 690 Fed. Appx. at 332 ("[A] plaintiff is not required to prove that a different warning would have averted the injury in question when the warning that was actually given was inadequate."). For these reasons, the Plaintiffs have established a material issue of fact as to whether the Defendants failed to adequately warn consumers. Therefore, to the extent that the Plaintiffs allege a failure

to warn claim under a theory of strict liability or negligence, the Defendants' motion for summary judgment will be denied.

### 3. Manufacturing Defect

In Kentucky, "a manufacturing defect exists in a product when it leaves the hands of the manufacturer in a defective condition because it was not manufactured or assembled in accordance with its specifications." *Greene v. B.F. Goodrich Avionics Sys., Inc.*, 409 F.3d 784, 788 (6th Cir. 2005) (citing *Ford Motor Co. v. McCamish*, 559 S.W.2d 507, 509–11 (Ky.App.1977)). The Plaintiffs have not alleged any facts consistent with a manufacturing defect claim. Therefore, to the extent that the Plaintiffs attempt to assert a manufacturing defect theory of liability under either a strict liability or negligence cause of action, the claim will be dismissed.

### 4. Breach of Warranty

Breach of warranty claims are "somewhat derivative" of strict liability and negligence product liability claims in that they also require proof of a defect and causation. *Prather*, 960 F. Supp.2d at 715. The court has already found that the Defendants did not meet their burden in establishing that no dispute of material fact exists as to the issues of defect and causation. Therefore, the court will consider each breach of warranty claim in turn.

#### a. Breach of Express Warranty

Kentucky's express warranty statute states, in relevant part, that:

(1) Express warranties by the seller are created as follows:

> (a) Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise.

     (b) Any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description.

KRS § 355.2-313.  Kentucky law does not require the seller to use any formal words or specific language to create an express warranty.  *Id*. at § 355.2-313(2).  *See also Overstreet v. Norden Labs., Inc.*, 669 F.2d 1286, 1290 (6th Cir. 1982) (finding that under Kentucky law, "language creating an express warranty need not contain special phrases or formal words."). However, a distinction exists between words and phrases meant to create an affirmation of fact or promise, and words "purporting to be merely the seller's opinion or commendation of the goods."  KRS § 355.2-313(2).  Such opinions or commendations of goods, or "puffing," by the seller, do not create express warranties.

The Sixth Circuit has held that the distinction between "puffing" and affirmation of fact "is that in the latter situation, the recipient of false information is in a position to reasonably rely on the assurances of the speaker."  *Naiser v. Unilever U.S., Inc.*, 975 F.Supp.2d 727, 734 (W.D. Ky. 2013) (quoting *Operation King's Dream v. Connerly*, 501 F.3d 584, 589 (6th Cir. 2007)). Further, "'puffing' is generally defined as an expression of exaggerated opinion – as opposed to a factual misrepresentation – with the intent to sell a good or service."  *Id*.  (internal quotation omitted.).

The Plaintiffs allege that the statement "Perfect for Bikini Area" is an express warranty by the Defendants because it creates an affirmation of fact regarding where the product is intended to be used.  They also argue that the term "Brazilian Formula" is an express warranty that the Product can be used for a Brazilian wax.  The Defendants, on the other hand, argue that each of these statements is "nothing more than a generalized statement regarding the Product, not an express warranty."  (DN 62, 12.)

While the term "Perfect," in and of itself, may be considered mere "puffing," the court finds the Plaintiffs have produced evidence that the phrase "Perfect for Bikini Area" and the term "Brazilian Formula" may constitute affirmations of fact. For example, the Plaintiffs offered evidence that a Brazilian wax specifically refers to the style of wax where pubic hair is completely removed from the pubic bone and labia. (DN 53, Exh. 10, 29.) They have also produced evidence that the term "Bikini Area," could be construed by consumers to encompass the pubic area. (DN 57, Exh. 8.) Certainly, these terms are not so generalized that a jury could not find that these phrases constituted affirmations of fact of where on the body the Product can be used.

The Defendants then argue that, even if the statements "Perfect for Bikini Area" or "Brazilian Formula" are considered affirmations of fact, "the Product was used contrary to its intended use." (DN 53, 30.) However, as has been detailed several times throughout this Memorandum, the Plaintiffs have provided evidence concerning the inadequacy and ambiguity of the warnings. Though the Defendants argue that the Plaintiffs' use of the Product in the pubic area constituted "clear contravention to the instructions," the court finds that whether or not the Plaintiffs reasonably construed the instructions is a dispute of material fact.

Lastly, the Defendants argue that there are no facts indicating that the Millers relied on the Products' alleged affirmations as the basis of the bargain between the parties. This argument also must fail. Before purchasing the Product, the Plaintiffs had discussed using an at-home waxing kit. (DN 53, Exh. 1, 7.) Based on this conversation, Timothy looked for waxing kits to be used on May and selected the Product for purchase. (*Id.*) Then, both Millers, after reading all of the instructions, directions, and warnings, proceeded to apply the Product exclusively in the pubic area. (DN 53, Exh. 1.) Viewing the facts in the light most favorable to the Plaintiffs, a

jury could find that the Millers relied upon the Product's statements that it was "Perfect for the Bikini Area" and was a "Brazilian Formula" in choosing to buy a wax to be used on May's pubic area.

For the reasons stated, the Defendants' motion for summary judgment will be denied as to the Plaintiffs' claim for breach of express warranty.

>   b.   *Breach of Implied Warranty of Merchantability and Breach of Implied Warranty of Fitness for a Particular Purpose*

The Plaintiffs' Amended Complaint states two counts of breach of implied warranty: breach of implied warranty of merchantability and breach of implied warranty of fitness for a particular purpose. Both claims must fail as a matter of law.

In 2006, the Kentucky Supreme Court explicitly found that the Kentucky legislature "expressly established the privity requirement" for breach of implied warranty claims. *Complex Intern. Co., Ltd. V. Taylor*, 209 S.W.3d 462, 465 (Ky. 2006). There is no dispute that Timothy purchased the Product at a retail store, and thus no buyer-seller relationship exists between Coty and the Millers. Without a buyer-seller relationship, no privity exists between the parties. For this reason, the court will grant the Defendants' motion for summary judgment as to the Plaintiffs' claims of Breach of Implied Warranty of Merchantability and Breach of Implied Warranty of Fitness for a Particular Purpose.

**C. Kentucky Consumer Protection Act Claim**

Next, the Plaintiffs allege that the Defendants violated the Kentucky Consumer Protection Act (KCPA). The KCPA states that: "Unfair, false, misleading, or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful." KRS § 367.170(1).

In order to sustain a cause of action under the KCPA, plaintiffs must either establish the existence of an express warranty for the benefit of the purchaser, or establish privity of contract between the buyer and seller. *See Naiser v. Unilever US Inc.*, 975 F. Supp.2d 727, 743 (W.D. Ky. 2013). As previously discussed, the court found that the Plaintiffs offered sufficient evidence of the existence of an express warranty to survive the present motion for summary judgment.

The Defendants argue that the Plaintiffs' KCPA claim must fail because the Product was not misbranded. Both parties agree that the Product falls under the Federal Food, Drug, and Cosmetic Act, in which a cosmetic is deemed misbranded:

> (a) If its labeling is false or misleading in any particular.
> . . .
> (b) If any word, statement, or other information required by or under authority of this chapter to appear on the label or labeling is not prominently placed thereon with such conspicuousness (as compared with other words, statements, designs, or devices, in the labeling) and in such terms as to render it likely to be read and understood by the ordinary individual under customary conditions of purchase and use.

21 U.S.C. § 362. Additionally, the FDA defines misbranding, in relevant part, as follows: "Among representations in labeling of a cosmetic which render such cosmetic misbranded is a false or misleading representation with respect to another cosmetic or a food, drug, or device." 21 C.F.R. § 701.19(a).

The Defendants claim that the Product was not misbranded or misleading because nowhere do the words "Brazilian wax" appear together on the Product box, but rather only the words "Brazilian formula." They further argue that the Plaintiffs have not offered any evidence that the chemical formula of the Product is not, in fact, a type of Brazilian formula. Construing the facts in the light most favorable to the Plaintiffs, the Court finds that this argument falls short. Even if the Product does technically constitute some type of Brazilian "formula" in its

chemical make-up, the Plaintiffs have introduced evidence that the very use of the word "Brazilian" could mislead users into believing that the wax is appropriate for full removal of pubic hair.  The Plaintiffs argue that this is particularly true when the term "Brazilian Formula" is coupled with such phrases as "All Over" and "Bikini Area."  The Plaintiffs have provided evidence creating a material issue of fact on their KCPA claim for misleading product labeling. The Defendants' motion for summary judgment as to the Plaintiffs' KCPA claim will be denied.

### D.  Punitive Damages

Lastly, Coty moves for summary judgment on the Plaintiffs' claim for punitive damages. Coty first argues that "[t]here can be no finding of punitive damages because Plaintiffs have failed to prove a negligence claim in that they failed to establish that the Product was defective." (DN 62, 14.)  Because the court has found that a genuine issue of material fact exists as to whether the Product was defective, this argument fails.

Coty also argues that, even if a jury could find that the Product was defective, the Plaintiffs cannot overcome the heightened standard that Kentucky imposes for the recovery of punitive damages.  Under KRS 411.184, punitive damages are available upon proof "by clear and convincing evidence, that the defendant from whom such damages are sought acted toward the plaintiff with oppression, fraud or malice." Ky. Rev. Stat. § 411.184.  In a products liability action, "[t]he plaintiff must prove, in addition to an injury-causing product defect, that something about the defendant's conduct was outrageous, was at least grossly negligent, and amounted to reckless indifference."  *Sufix, U.S.A., Inc. v. Cook*, 128 S.W.3d 838, 841 (Ky. Ct. App. 2004).

Even taking the facts in the light most favorable to the Plaintiffs, a reasonable jury could not find that the Product's design, labeling, and warnings were so defective or inadequate as to amount to gross negligence.  The Plaintiffs have not provided any evidence that the Defendants'

conduct was "outrageous" such that the Defendants acted with "oppression, fraud or malice." The Defendants' motion for summary judgment will be granted as to the issue of punitive damages.

## IV.    CONCLUSION

For the foregoing reasons, the court will order the following:

(1) The Defendants' motion for the exclusion of expert testimony will be **GRANTED IN PART** and **DENIED IN PART** to the following extent:

    a.   The motion to exclude the testimony of Dr. Pollack-Nelson will be **GRANTED** as to testimony concerning the Product's underlying design.

    b.   The motion to exclude the testimony of Mr. Kitzes will be **GRANTED** as to testimony concerning the Product's underlying design.

    c.   The motion to exclude the testimony of Ms. Carden will be **DENIED**.

(2) The Defendants' motion for summary judgment will be **GRANTED IN PART** and **DENIED IN PART** to the following extent:

    a.   The Defendants' motion for summary judgment will be **DENIED** as to the Plaintiffs' claims of a design defect under strict liability or negligence (Counts I – II).

    b.   The Defendants' motion for summary judgment will be **GRANTED** as to the Plaintiffs' claims of a manufacturing defect under strict liability or negligence (Counts I – II).

    c.   The Defendants' motion for summary judgment will be **DENIED** as to the Plaintiffs' claims of failure to warn under strict liability or negligence (Count III).

d. The Defendants' motion for summary judgment will be **GRANTED** as to the Plaintiffs' claim of Breach of Implied Warranty of Merchantability (Count IV).

e. The Defendants' motion for summary judgment will be **DENIED** as to the Plaintiffs' claim of Breach of Express Warranty (Count V).

f. The Defendants' motion for summary judgment will be **GRANTED** as to the Plaintiffs' claim of Breach of Implied Warranty of Fitness for a Particular Purpose (Count VI).

g. The Defendants' motion for summary judgment will be **DENIED** as to the Plaintiffs' Kentucky Consumer Protection Act claim (Count VII).

h. The Defendants' motion for summary judgment will be **GRANTED** as to the Plaintiffs' claim for punitive damages (Count IX).

(3) The Plaintiffs' claims for Manufacturing Defect, Breach of Implied Warranty of Merchantability, Breach of Implied Warranty of Fitness for a Particular Purpose, and punitive damages will be **DISMISSED WITH PREJUDICE**.

An order will be entered in accordance with this opinion.

March 21, 2018

**Charles R. Simpson III, Senior Judge**
**United States District Court**

- 31 -